# EXHIBIT A

Arbitration Opinion and Award

BARRY WINOGRAD
Arbitrator and Mediator
1999 Harrison Street, Suite 1400
Oakland, CA 94612
(510) 465-5000

IN ARBITRATION PROCEEDINGS PURSUANT TO

AGREEMENT BETWEEN THE PARTIES

| | |
|---|---|
| In the Matter of a Controversy Between: ) | |
| ) | |
| ) | |
| TEAMSTERS LOCAL 631                  ) | Arbitrator's |
| ) | File No. 17-253-LA |
| ) | |
| and,                              ) | |
| ) | |
| ) | |
| VECTRUS SYSTEMS                     ) | ARBITRATION |
| ) | OPINION AND AWARD |
| ) | (April 27, 2018) |
| [Re: Contract Interpretation Dispute) ) | |
| ———————————————————) | |

Appearances: Richard G. McCracken (McCracken, Stemmerman &
Holsberry), attorney for Teamsters Local 631; Stuart Newman and
Kaitlyn Whiteside (Seyfarth Shaw), attorneys for Vectrus Systems.

INTRODUCTION

This dispute between Teamsters Local 631 and Vectrus Systems
arises following the Company's assumption of a previous labor
agreement between the Union and a predecessor employer.  The

Union maintains that the Company did not retain employees in accord with the terms of the labor agreement.  The Company contends that its actions were appropriate under the agreement and applicable law.

The undersigned was selected by the parties to conduct a hearing and to render a final and binding award.  The hearing was held on February 13, 2018 in Las Vegas, Nevada.  At the hearing, the parties were afforded an opportunity to examine and cross-examine witnesses, and to introduce relevant documentary evidence.  A transcribed record of the hearing was prepared.  The dispute was deemed submitted on April 2, 2018, upon receipt of the final posthearing brief.

ISSUES

The parties were unable to agree upon a statement of the issues to be submitted for resolution, but agreed that the arbitrator can frame the issues based on their respective statements and the evidence and argument presented.  (Tr. 6-8.) The undersigned has determined that the issues to be resolved are as follows:  Whether the Company violated the collective bargaining agreement when it determined which individuals to

2

employ for its operations in positions covered by the agreement;
if so, what is the appropriate remedy?

At the outset of the hearing, the parties agreed that the
result in this proceeding will govern several related grievances
identified in previous communications between the parties.  (Tr.
12-13.)

RELEVANT CONTRACT PROVISIONS

The following terms of the labor agreement have bearing on
this case:

AGREEMENT

This agreement is entered into October 1, 2013 by and
between PAE, Range Support Services, C. Martin Company
Inc., and Fluor Federal Solutions LLC, hereinafter
referred to as the "Contractor" and the Teamsters,
Chauffeurs, Warehousemen and helpers of America Local
Union 631, hereinafter referred to as the "Union."....

ARTICLE 3 – MANAGEMENT RIGHTS

SECTION 1.  Except as specifically limited by this
Agreement, any and all of the rights, duties, powers,
functions, authorities, and prerogatives of the
Contractor to manage, control and direct its business,
operations, and activities are vested in and retained
by the Contractor, including, but not limited to, the
assignment and direction of its Employees.

SECTION 2.  The contractor shall be the sole judge of
the competence of each Employee and of the number of

employees required to perform any work subject to this
Agreement. The Contractor shall have the right to hire,
promote, suspend in lieu of discharge, discharge with
just cause, or lay off Employees at its discretion and
to reject any applicant for employment.
....

ARTICLE 7 - HIRING PROCEDURE
....

SECTION 2.  The Contractor shall be the sole judge as
to the competence of all applicants, and the Contractor
may reject any job applicant. The Contractor retains
complete rights to determine eligibility for employment
for all job applicants and the right to conduct
necessary screening to determine eligibility. The
Contractor agrees to furnish the Union on a quarterly
basis, upon request the qualifications for each
classification of their Company, that relate to the
CBA.

SECTION 3.  The Contractor will notify the Union
Dispatch Office by facsimile of all vacancies in the
Bargaining Unit, whether part-time, full-time, or
temporary, and state the job requirements. The Union
will have three (3) recurring working days, by mutual
agreement, to refer qualified applicants for the
vacancies. If the Union is unable to provide applicants
acceptable to the Contractor within three (3) working
days, the Contractor will utilize other employment
resources to fill the vacancies. Temporary employment
is defined as a job lasting up to sixty (60) calendar
days.

SECTION 4.  In the event the contractor finds qualified
individuals to fill the vacancies, the Contractor shall
notify the Union business Agent (electronically) within
three (3) working days of the names, start dates, job
classifications and work locations of each individual.

SECTION 5.  The Contractor agrees that all new
Employees hired for vacancies in the Bargaining Unit
will be referred by the Contractor to the Union before
starting work at their work location. The purpose of
this referral is to introduce the newly hired Employees
to the representatives of the Union.

ARTICLE 28 - SENIORITY

SECTION 1.  Seniority is defined as the total accumulated period of time an Employee has worked with the Contractors under this Contract since his/her last date of hire. In addition, for those Employees hired by the Contractors on October 1, 2002, seniority shall include the time worked since last date of hire by the predecessor contractors.
....

SECTION 3.  Subject to the provisions of Article 6, Nondiscrimination/Equal Employment Opportunity/ Affirmative Action Program, reductions in force/layoffs and recalls/rehires shall be made on the basis of seniority and the ability to perform available work....

SECTION 4.  In the event an Employee is reduced in force/laid off and is recalled/rehired within one (1) year, his/her seniority shall include that seniority which he/she had accumulated prior to his layoff.
....

SECTION 6.  Seniority shall be lost by an Employee under the following circumstances:

  a) Discharge by the Contractor for cause;
  b) Quit or voluntary termination;
  c) Layoff for a period in excess of one (1) year;
  d) Failure to report on time when recalled from layoff;
  e) Failure to return to the active payroll within one (1) year of release from employment for medical reasons;
  f) Released from employment due to inability to secure or retain User access to area for which he was hired.

SECTION 7.  Subject to the provisions of Article 6, Non-discrimination/Equal Employment Opportunity/ Affirmative Action Program, recall/rehire shall be in reverse order of reduction in force/layoff subject to the Contractor's need for workers to perform the work available and subject to satisfactory qualifications to perform the work. Employees being recalled shall be notified by the Union....

SECTION 8.  When a job is abolished or a layoff is in effect, the affected Employee shall have the right to exercise his seniority rights to displace another Employee, in an equal or lower classification, provided he/she has the skill and ability to perform the job. Such Employee shall retain full seniority rights for all purposes. If a job is re-established, it shall immediately be put up for bid.

SECTION 9.  All employees shall undergo an initial probationary period. Those hired into a classification listed in Appendix A shall undergo a ninety (90) day initial probationary period. Those hired into a classification listed in Appendix B shall undergo a sixty (60) day initial probationary period. During such probationary period, the Employees shall accrue no seniority for any purpose. Upon satisfactory completion of the probationary period, the Employees shall be entitled to seniority dating back to the original date of hire. Such employees may be discharged for any reason during this probationary period without any right to dispute the discharge under the Grievance and Arbitration Procedure.
....


ARTICLE 31 - DISCIPLINE AND DISCHARGE

SECTION 1.  It is understood and agreed by the Contractor and Union that the principle of progressive discipline will apply. The Contractor may discipline or discharge Employees for just cause. All forms of discipline, including warnings, shall be administered consistently with the severity of the offense committed and the Employee's prior disciplinary history. Should the Employee feel such action improper, he/she may utilize the Grievance Procedure in Article 30 provided the employee has completed the probationary period defined in Article 28, Section 9.
....


ARTICLE 33 - SUBCONTRACTS

SECTION 1.  The Contractor agrees that in subcontracting any work of a substantial or major or continuous nature which is covered by this Agreement to any person, firm, corporation, partnership or other

organization, it will require the subcontractor to
observe the applicable wage rates, hours and working
conditions set forth in this Agreement.
....


ARTICLE 50 - SUCCESSOR CLAUSE

SECTION 1.  This Agreement shall be binding upon the
successors and assignees of the parties hereto and
shall not be affected by any change in the ownership,
bankruptcy, or management, of either party hereto. The
Union expressly acknowledges and agrees that the
Contractor is performing under contract with the United
States Air Force, and that in the event the
Contractor's contractual relationship with the United
States Air Force shall terminate, the Contractor shall
be relieved of all other obligations under said
Agreement.
....


FACTUAL ANALYSIS


1.   Employment Setting


        This case concerns the Company's operations at the Nevada

Test and Training Range (NTTR) in southern Nevada.  The Company

is a subcontractor to URS Federal Services and provides

construction and maintenance work at the NTTR.  (Tr. 24, 68.)  In

fall 2017, under the federal government's contract bid process,

the Company assumed much of the work previously done by a

subcontractor, C. Martin, at the NTTR.  (Tr. 24-26.)[1] C. Martin
had been a subcontractor for PAE, a predecessor to URS Federal
Service.

PAE, C. Martin, and other subcontractors, were parties to a
collective bargaining agreement with Teamsters Local 631.  (Jt.
Exh. 1.)  The bargaining unit had been organized by the Union in
2002.  (Tr. 27.)  The bargaining agreement between the PAE
parties and the Teamsters was for the period 2013 to 2017.  An
extension negotiated by PAE and the Teamsters applied to the
labor agreement for the period August 28, 2017 through September
30, 2018.  (Jt. Exh. 2.)  The extension agreement rolled over the
terms of the previous labor agreement and also provided for wage
and benefit increases.

For the Company's takeover of operations at the NTTR, food
service, housekeeping and other service positions were carved out
of the previous unit and were no longer subject to Company
control.  (Tr. 29-34.)  In connection with the Company's
takeover, it entered a "bridge agreement" with the Union on
September 26, 2017.  The agreement states, in relevant part:

_____

[1]In the record, "C. Martin" also is referred to at times as
"C Martin," without a period in the name.  For stylistic
convenience, common punctuation usage is used in this decision.

The parties hereby agree URS Federal Services, Inc.,
and its subcontractor, Vectrus, Inc., Arcata
Associates, Inc., Chugach Federal Solutions, Inc.,
agree to accept all the terms and conditions of the
Collective Bargaining Agreement (CBA) between PAE,
Range Support Services, Fluor Federal Solutions LLC.,
C. Martin Company, Inc., and the International
Brotherhood of Teamsters, Local 631, Project
Maintenance and Operations Agreement dated October 1,
2013 through September 30, 2017, and extended by
written agreement with PAE through and including
September 30, 2018. This includes all Memorandums of
Agreement/Understanding made between parties and
attached to this CBA.

This Agreement is for the performance of work on the
Range Support Services II contract at the Nevada Test
and Training Range Complex and will become effective
October 25, 2017.  (Jt. Exh. 3.)

2.   <u>Facts Giving Rise to the Dispute</u>

On September 26, 2017, the same day the bridge agreement was
executed, the Company distributed letters to 132 employees of C.
Martin offering positions with the Company.  (Co. Exh. 1; Tr. 62-
65.)  October 25, 2017 was provided as the anticipated start of
employment.  The offer letters did not mention the bargaining
agreement with the Union, and advised employees that the Company
could end "your employment with Vectrus at any time, with or
without notice and with or without cause.  As such, your
employment is at will...."  (Co. Exh. 1, p. 2.)

17-253.Decision.Vectrus.Teamsters631

Of C. Martin's employees, 26 were not offered positions by the Company. The Company was informed that those who were offered positions, and those who were not, were given layoff notices by C. Martin on October 24. (Tr. 54.)

The reduction of the C. Martin workforce was consistent with the Company's contract bid to the federal government by utilizing fewer employees than those used by C. Martin. (Tr. 68-69.) This reduction was separate from the carve out of food service and other service employees from the bargaining unit.

In a phone call around September 20, the Company's human resources director, Jack Peterson, advised Teamsters representative, Darrin Bradburn, that offer letters would be sent. (Tr. 66-68.) Mr. Peterson did not inform the Union that some employees would not get an offer letter, although he was aware at the time that there was a chance not all would be employed based on changes in the workforce. (Id.; Un. Exh. 1.)

Those employees who were offered positions by the Company received letters based on discussions between Company and C. Martin managers about employees to retain. (Tr. 70-71.) In deciding who to keep and who to let go, the Company did not review employee personnel files. Mr. Peterson described the

process in his testimony:

> Q.  So it was the C. Martin's managers who gave
> the information about who to hire and who not to hire?
> A.  Right.
> Q.  Do you know what basis they used for those
> recommendations?
> A.  I do not.
> Q.  Did you ever inquire about why some people
> were being offered and others were not?
> A.  I did not.
> Q.  Did anyone from Vectrus review personnel files
> of those people who were being given offers?
> A.  I don't believe that we would be given access
> to those personnel files.
> Q.  Who had them?
> A.  It would be C. Martin.
> Q.  So this is just based on the word of the C.
> Martin managers?
> A.  To my knowledge, yes.

For the Company's employees, the parties agree that the last day of work performed by C. Martin and the first day of work for the Company was October 25, 2017.  (Tr. 21.)  As observed in the Union's post-hearing brief, some employees were out of a job despite years of service, and less senior employees were favored in some instances.  (Un. Br., pp. 9-10, 12-14, Exh. A.)

Prior to the Company's operational control as of October 25, the Union grieved the decision about who the Company employed. (Jt. Exh. 4.)  The grievance, dated October 13, 2017, cited Article 28.3 and "all others that apply," and alleged:

> Company (Vectrus) violated Article 28, Section 3
> recalls/rehires by not rehiring on the basis of
> seniority and the ability to perform available work. 29

Bargaining Unit Employees weren't rehired on the basis of seniority and the ability to perform available work. Teamsters Union Local 631 request effective immediately that the Company (Vectrus) rehire Bargaining Unit Employees on the basis of seniority and the ability to perform available work. All Bargaining Unit Employees effected be made whole for all lost wages and benefits/ seniority. (Jt. Exh. 4.)

The Union's argument was set forth in subsequent correspondence, as follows:

Vectrus is taking over operations on October 25, 2017 immediately following the cessation of operations by its predecessor. This is a seamless transition by virtue of the bridge agreement. The collective bargaining agreement is in force for PAE up to the very moment when Vectrus takes over, then Vectrus is covered by the agreement. At all times, the employees in the unit represented by Local 631 are covered by the protections of the CBA. Specifically these include Article 28, Section 3, which prohibits a layoff out of seniority order. Your plan is apparently to take over on October 25 with fewer employees than P.A.E employed, which is a layoff. The layoff must be done by seniority. You may call it a hiring decision, but since these workers were employed one day and not the next, it is a layoff. Unless it is something even more drastic: a termination. If it is your intention to bring in other employees instead of these workers, either now or in the future, this amounts to a termination. Terminations are governed by Article 31, Section 1. Just cause is required. You have not cited any just cause and we do not believe any exists. Therefore, whether these employees have been laid off or terminated, the action is in violation of the CBA. (Jt. Exh. 5.)

The Company's contrary position was shared in correspondence:

> We have committed no violation as you allege.
>
> Vectrus is not an alter ego of C. Martin or PAE, but a separate business enterprise. As a result, C. Martin's employees — which you inadvertently refer to in your letter as PAE's — cannot and did not simply "transition" to Vectrus. Rather, a new employment relationship had to be established through the usual process of offer and acceptance. This was accomplished through Vectrus' employment offers prior to October 25.
>
> Nothing in the Local 631 CBA provides that a prior contractor's employees somehow become a subsequent contractor's employees without being hired. Nor is there any express guarantee of continued employment in Article 50 or otherwise. To the contrary, the CBA recognizes that a hiring process will occur.
>
> Vectrus acted consistent with Service Contract Act Regulations establishing such hiring process, i.e. 48 CFR 52.222-17, and which explicitly recognize that all of a prior contractor's employees need not be hired.
>
> Accordingly, Vectrus respectfully denies Local 631's grievance.  (Jt. Exh. 6.)

As additional support for the Union's case, it offered evidence at the arbitration of previous practice for decades with predecessor contractors for bargaining units at the NTTR represented by the Teamsters.  (Tr. 38, 47, 51-52, 57.)  For those bargaining agreements, contractor employees have been carried over into the new operation, with one exception.  The only instance of a reduction in force involved a warehouse employee who was not retained by the successor company, and the

reduction was implemented in seniority order.  There is no evidence that either URS Federal Services or the Company were parties to the previous agreements, or assumed its current status with knowledge or notice of the past practice cited by the Union.


DISCUSSION


The Union contends that the Company, as a successor employer under Article 50, was obliged by Article 28 to retain in seniority order employees of the prior contractor for work to be performed.  The Union's case relies on contract language assumed by the Company under the 2017 bridge agreement, and on previous practice at the NTTR.


The Company maintains that it had a management right to hire employees, and that its actions prior to October 25, 2017 were not governed by the labor agreement as it was not effective until October 25.  Accordingly, for the Company, it was not required to apply seniority to its hiring decision.  Nor, in the Company's view, can past practice of previous employers control in this instance.

Before reaching the merits of this dispute, the Company has raised a preliminary objection that the arbitrator lacks jurisdiction over the subject matter because its agreement with the Union was not effective until October 25, 2017.  (Tr. 9; Cc. Brief, pp. 6-7.)  For this reason, according to the Company, the Union's grievance earlier in October 2017 concerns action by the Company prior to the labor agreement applying to the Company's operations.  This argument is tied to an interpretation of the agreement, but is misplaced for the reasons that follow.

Based on the evidence and argument presented, it is concluded that the Union's previous agreement with PAE applies to the Company's operations at the NTTR.  The bridge agreement expressly assumes the previous agreement for work performed, effective October 25, 2017.  Nevertheless, contrary to the Company's position in this case, its actions prior to October 25 were in anticipation of its operational control as a successor employer under Article 50 of the labor agreement.  The text of the bridge agreement underscores this point because it expressly governs the relationship between the Company and the Union. Notably, the bridge agreement states the Company's promise "to accept all the terms and conditions" of the prior PAE agreement, and referenced the Union's extension with PAE "through and including September 30, 2018," long after the Company's takeover.

The communications between the Company and C. Martin's managers demonstrate the Company's preparation in the period prior to October 25.  In this context, the rights established under the PAE labor agreement were rights of a continuing nature binding on the successor by virtue of the Company's acceptance of those terms.  To hold otherwise would permit a promise securing the Union's reliance, but failing to live up to the promise that is the foundation of the bridge agreement.

In applying the labor agreement, the outcome in this case is controlled by the seniority provision of the contract assumed by the Company as it covers the C. Martin employees based on the continuing nature of that agreement.  In this respect, the terms of the agreement governed any reduction in force arising from the Company's contract with URS and the federal government.  Article 28.3 explicitly requires reductions to be carried out on the basis of seniority unless qualifications justify a different outcome.  Consistent with this construction of the text, Article 28.6 spells out the ways in which seniority can be broken.  A unilateral decision by a successor company is not one of the ways listed.

Moreover, even if the Company is correct that C. Martin is responsible for the layoffs, and that the Company had no duty to

adhere to employee seniority before October 25, 2017, the Company
still was obliged to apply Article 28.7 for "recalls/rehires" as
of October 25.  Its previous offer letters do not excuse the
Company from this obligation since the Company had assumed the
previous agreement, nor is there a clear waiver of a Union
objection based on the partial disclosure in the phone call
between Mr. Bradburn and Mr. Peterson.  Instead, the offer letter
appears to have disregarded the bargaining agreement by
characterizing employees as "at will" and as subject to
termination without cause, contrary to Article 31.

By applying the labor agreement in this manner, there is no
interference with the Company's prerogative under the management
rights provision in Article 3 to determine the number of
employees needed for its new operations.  The same prerogative is
identified by the Company as an exception for staff reductions
under federal regulation.[2]  Although the regulations provide for
contractor rights, they do not include any language negating
bargaining agreements. Further, the regulations protect
employment opportunities of predecessor contractor employees,
including use of a seniority list when available.[3]

---

[2]48 C.F.R. Section 22.1203-6; 29 C.F.R. Section 9.12(d).

[3]29 C.F.R. Section 9.12(a).

Ultimately, even if the size of the workforce is a Company determination, the process for staffing the workforce is governed by the labor agreement.  Under Article 3, the Company's rights are "specifically limited" by other terms of the agreement; in this case, the seniority protections of Article 28.

Other terms of the labor agreement support this outcome. Contrary to the Company's contention, its hiring prerogative under Article 7 is inapplicable because, in this situation, the Company was not filling vacancies as contemplated by Article 7, including notice to the Union of unit vacancies with opportunities afforded for the Union to assist in filling vacancies.  Also supporting this conclusion, there is no evidence that the employees in the Company's successor workforce were treated as new employees in probationary status with the Company.

Nor was the Company taking disciplinary action under Article 31 since there is no contention by the Company that it had just cause to remove employees from the workforce.  If anything, evidence of the potential for arbitrary decision-making by the Company is shown by its discussions with C. Martin managers, without reference to personnel records, in order to decide who to employ.

Last, in light of the conclusions stated above, there is no reliance in this decision on past practice of other contractor transitions as governing the present bargaining relationship. Here, there is no evidence that the Company or URS Federal Services assumed operational responsibility with knowledge or notice of the practice cited by the Union, and therefore could not have accepted the practice as binding.

4.    Remedy

As appropriate relief, employees who were reduced in force from the C. Martin workforce, in positions that continued to be covered by the Company's operations, are to be reinstated in seniority order to the positions previously held, with seniority restored.  These employees also are to be made whole for wages and benefits lost.  To the extent the Company fails to reinstate employees in the positions subject to this reinstatement order, make whole payments shall continue until the employees who are not reinstated are restored to the workforce.

AWARD

Based on the testimony and documentary evidence, and the findings and conclusions set forth above, the undersigned renders the following Award:

1.   The grievance is sustained.  The Company, as a successor employer under Article 50 of the labor agreement, violated Article 28 of the agreement by reducing the workforce without applying seniority to determine employees to be retained and/or recalled, and those to be laid off.

2.   Employees affected by the Company's violation of Article 28.3 will be reinstated to the workforce without loss of seniority, and with make whole relief for the period of the layoff until reinstated to the workforce.

3.   Pursuant to the stipulation of the parties, the undersigned will retain jurisdiction for 120 days from the date of this Award to resolve any dispute over implementation of the Award.

Date: April 27, 2018

BARRY WINOGRAD
Arbitrator

17-253.Decision.Vectrus.Teamsters631

20